**Vickie HALL, Appellant**

v.

**Timothy BIAS and Rennea Bias, Appellees.**

**No. CA 09–257.**

Court of Appeals of Arkansas.

Feb. 9, 2011.

---

**25.** Ark. R.Crim. P. 27.3.

**26.** *Stenhouse v. State,* 362 Ark. 480, 209 S.W.3d 352 (2005).

**27.** *Id.*

**28.** *Id.*

Judith Rebecca Pratt, Fayetteville, for appellant.

Michael T. Newman, Fort Smith, for appellee.

LARRY D. VAUGHT, Chief Judge.

In 2002, appellant Vickie Hall and appellees Rennea and Timothy Bias purportedly entered into a contract for the sale of land. Hall made a down payment to purchase the property and made monthly payments until April 2007. In May 2007, Hall filed suit against the Biases, alleging breach of contract and seeking specific performance, or in the alternative, rescission of the contract. After a bench trial, the Crawford County Circuit Court entered an order, finding that there was no meeting of the minds on the essential terms of the contract; therefore, there was no enforceable contract between Hall and the Biases. The trial court further found that the Biases were not obligated to return the payments they received from Hall, concluding that she waived her right to rescission. Hall has appealed the trial court's order. We reverse and remand.

In February 2002, Hall met with Tim Bias on a mountain in Crawford County, Arkansas. According to Hall, Tim said that he owned twenty acres of land there and that he would sell it to her for $20,000. Hall agreed to the price, and she gave him $100 as a down payment while they were standing on the mountain. She stated that they did not discuss the payment of interest, that she was not given a legal description of the land,[1] and that they did not sign a contract. Hall believed, based on her conversations with Tim, that she was to make another payment of $400 (for a total down payment of $500), and then in June 2002 begin making monthly payments of $240.32 until the property was paid in full. Hall paid the $400, and thereafter, monthly payments were automatically withdrawn from her checking account until April 2007.

Hall admitted that in 2005 a representative of the Biases handed her a written contract for the purchase of the property; however, she stated that she did not sign it or any other contract.[2] Hall's daughter

---

1. Hall testified that she and Tim walked around part of the property, and Tim simply pointed out to her where he thought two corners of the property were.

2. She denied receiving a written contract from the Biases before 2005.

also testified that her mother received the written contract in 2005 but that she did not sign that contract. In this contract, the sale price for the land was $25,000, plus 11.5% interest for a total purchase price of $87,000 over the course of a thirty-year mortgage. Despite the fact that the contract terms differed from her understanding of the agreement, Hall continued making monthly payments for the property.

In 2007, Hall, who thought that she owed only $5000 for the property, called the Biases to confirm the payoff amount. According to Hall, Rennea Bias laughed when Hall said she thought that she had almost paid for the property, and Rennea did not know what the payoff amount was. Concerned, Hall checked the county tax records to confirm the boundaries and ownership of the property that she was purchasing. She was unable to find twenty acres in that [3]area owned by the Biases.

Because the terms of the written contract were not the same as the terms to which she orally agreed and because she thought that she was being "scammed," Hall stopped making payments in April 2007. The next month, she filed a complaint against the Biases, seeking specific performance (compelling the Biases to convey to her title to the land). In the alternative, she sought rescission of the contract (requesting reimbursement for the payments she made for the property) because of her minimal use of the property.[3]

In response to Hall's complaint, the Biases answered and counterclaimed, alleging that Hall breached a written agreement and that she was in default. They requested that Hall vacate the property and that the trial court declare the payments Hall had made rent and liquidated damages.

At trial, Tim Bias testified that in 2002 he and Hall orally agreed that she would purchase approximately twenty acres from him.[4] He agreed that he pointed out to Hall only two corners of the property. He added that he did not know the actual size of the land and that there was no survey or description of it. He testified that they agreed Hall would pay $25,000 plus interest for [4]the land.[5] He conceded that some of the terms were "fuzzy"—the amount of property, the reservation of mineral rights and easements, a land description, the specific rate of interest, the amount of the monthly payment, and a default or forfeiture clause. He further stated that it was his desire that they reduce their agreement to writing.

Tim testified that one week after Hall gave him the additional $400 down payment, he gave her a written contract to sign, and he went over the terms of the contract with her. He said that she did not object to the stated price of $25,000; however, she did not sign the contract. Tim said that Hall told him that she would sign and return it later. Hall returned to

---

3. Hall testified that from 2002 to 2007 she visited the property only three times, and on these visits, she only looked at the property. She said that she never ate a meal there, never spent the night there, did not build anything on it, did not make any improvements to it, did not remove anything from it, and did not maintain it.

4. Tim testified that he did not have title to the property he was selling to Hall. The property was actually owned by Bay View Financial (BVF), and he was in the process of purchasing it from BVF, but had not yet acquired it. Tim admitted that he did not tell Hall about his arrangement with BVF.

5. He also said that he and Hall agreed that he would reserve an easement on her property so that he had access to other property he owned that was adjacent to it.

Tim's office on another occasion to set up the automatic payments, but she did not have the signed contract. She said that she forgot it. According to Tim, the Biases lost contact with Hall for a couple of years, but they continued to receive her monthly payments. Tim stated that they mailed her the contract on several other occasions with no response.

In another effort to have Hall sign the contract, Tim asked Rennea's brother, Joel Edwards, to hand-deliver it to Hall. Edwards testified that during the summer of 2005, he handed a copy of the written contract to Hall in the presence of her daughter. He said that after he handed the papers to Hall, he also explained the contract terms to her. He added that Hall had no objection to any of the terms. He requested that she sign it, have it notarized, and return it to the Biases.

Tim testified that he did not realize that Hall thought she was receiving an interest-free loan to purchase the property and that he never discussed giving her such a loan. He stated that if Hall had disagreed with the terms of the written contract, she could have stopped making payments. He testified that in total, she paid the Biases about $15,000. He added that she continued to make payments for nearly two years after she received the contract in 2005. He claimed that Hall was not entitled to the return of her money because they had a verbal contract, and he held the land for her from 2002 until 2007, planning to give her the deed once the loan was paid in full.

At the conclusion of the bench trial, the court found that the case was a "giant misunderstanding." It found that there was no contract between the parties because there was no meeting of the minds between Hall and the Biases. There was ambiguity as to price, boundary, acreage, and easements. The court found it inconceivable that Hall believed that she could purchase the land interest free, but based on her lack of sophistication in real-estate matters, it had no doubt that she thought that she could. It found that Hall did not partially perform the contract because there was no contract. The trial court also found that from 2002 to 2007 the Biases honored the agreement as they did not sell the property or do anything to divest Hall's interest in it. Finally, the court asked the parties to brief the issue of whether Hall forfeited the payments she had made to the Biases. Thereafter, the trial court entered an order that outlined the oral findings reached at the bench trial, and it concluded the following:

7. The Court finds that [the Biases] are not obligated to refund any of the monthly payments. Since at least September 2005, when [Hall] admitted receiving a copy of the proposed contract, [she] has known or should have known that the purchase price and the number of the required payments were substantially different from the terms that [she] understood. There was also testimony from which the Court could find that [Hall] knew of the potential problem much earlier, when [she] picked up a copy of the proposed contract from [Tim's] place of employment about 30 days after [Hall] and [Tim] first met. Under these circumstances and the rational[e] of the Arkansas Supreme Court in the case of *Massey v. Tyra*, 217 Ark. 970, 234 S.W.2d 759 (1950), [Hall] is not entitled to recover any of the monthly payments. [Hall] had the option of terminating the transaction at that point and [Hall] waived that option by continuing to exercise ownership over the property and by continuing to pay the monthly payments.

8. [Hall's] failure to act over such a long period of time constitutes a waiver

of any right to seek a return of the monthly payments under the theory that the Arkansas Supreme Court used in the case of *Herrick v. Robinson,* 267 Ark. 576, 595 S.W.2[d] 637 (1980). Specifically, a party waives the right to seek rescission of a contract by continuing to make payments and by exercising ownership over the property.

9. [Hall] has had the use and benefit of the property in question since March 2002, during which time [the Biases] treated [Hall] as the owner of the property. For the same period of time, [the Biases] lost the opportunity to sell or lease the property, and therefore the court elects to treat all prior payments as rent.

Hall timely appealed from the trial court's order. She argues that the trial court erred (1) in finding that she forfeited the $15,000 in payments she made to the Biases; (2) in finding that she waived her right to rescission of the contract by continuing to make payments when she was on notice of the parties' material differences in the understanding of the contract; and (3) in finding that the payments she made constituted rent because the land was wild and unimproved and never generated any rentals.

The standard of review on appeal from a bench trial is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Robinson v. Villines,* 2009 Ark. 632, at 7, 362 S.W.3d 870, 874. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, when considering all of the evidence, is left with a definite and firm conviction that a mistake has been committed. *Robinson,* 2009 Ark. 632, at 7, 362 S.W.3d at 874. However, a trial court's conclusion on a question of law is reviewed de novo and is given no deference on appeal. *Robinson,* 2009 Ark. 632, at 7, 362 S.W.3d at 874.

In this appeal, Hall makes several arguments in favor of reversal pertaining to contractual remedies; however, they are inapplicable because the trial court found that there was no meeting of the minds between the parties and, as such, no enforceable contract. Hall did not appeal these findings. Without a contract, Hall's arguments regarding forfeiture, rescission, and the payment of rents simply do not apply. But our analysis does not end here.

It is apparent that after the trial court found that there was no enforceable contract, the court (citing *Herrick v. Robinson,* 267 Ark. 576, 595 S.W.2d 637 (1980) and *Massey v. Tyra,* 217 Ark. 970, 234 S.W.2d 759 (1950)), applied the contractual remedy of rescission (or waiver thereof) to reach its finding that Hall was not entitled to reimbursement of the money she paid to the Biases. In *Massey* and *Herrick,* our supreme court held that a party waives the right to seek rescission of a contract by continuing to make payments and by exercising ownership over the property. *Herrick,* 267 Ark. at 585, 595 S.W.2d at 643; *Massey,* 217 Ark. at 975, 234 S.W.2d at 762. However, the facts in these cases are very different from the facts in the instant case. In *Herrick* and *Massey,* rescission was sought based on a contract that actually existed, and in both cases, fraud or misrepresentations was the basis for rescission. *Herrick,* 267 Ark. at 585, 595 S.W.2d at 643; *Massey,* 217 Ark. at 974, 234 S.W.2d at 762. In the instant case, there was no contract to rescind, and there were no allegations of fraud or misrepresentation. In fact, the trial court specifically found that there was no fraud on the part of the Biases. Therefore, as a matter of law, we hold that the trial court erred in applying the contractual remedy of rescission (or waiver of rescission) in light of its

finding that there was no enforceable contract between the parties.

■ One remedy consistent with a finding that there is no enforceable contract is unjust enrichment.[6] This was the remedy applied in *Grisanti v. Zanone III,* 2010 Ark. App. 545, 336 S.W.3d 886, a case similar to the case at bar in that the trial court found that there was no contract because there was no meeting of the minds on material provisions. Our court stated there that, "[i]n general, recovery for unjust enrichment is based upon what the person enriched has received rather than what the opposing party has lost." *Grisanti,* 2010 Ark. App. 545, at 6, 336 S.W.3d at 890. We further held that the issue of unjust enrichment is a question of fact. *Id.*

Accordingly, we reverse and remand with instructions for the trial court to make findings of fact and to enter an order fashioning a remedy consistent with its finding that there was no enforceable contract between the parties.

Reversed and remanded.

HART, GLADWIN, GRUBER, and GLOVER, JJ., agree.

ABRAMSON, J., concurs.

RAYMOND R. ABRAMSON, Judge, concurring.

I concur in both the analysis and the result in the majority opinion, but I write separately to further address the nature of recovery available to the parties. It is generally recognized that, if a contract is invalid because the minds of the parties did not meet as to some of the essential terms thereof, a party who furnishes something to the other party, relying upon the terms as he understood them, will not be left without a remedy. *See* 66 Am.Jur.2d *Restitution and Implied Contracts* § 26 (2001).

One such remedy is unjust enrichment. Unjust enrichment is the principle that one person should not be permitted to unjustly enrich himself at the expense of another, but should be required to make restitution for property or benefits received, retained, or appropriated, whether requested or not, where it is just and equitable. *Adkinson v. Kilgore,* 62 Ark. App. 247, 970 S.W.2d 327 (1998). In most instances, where the parties have engaged in an unsuccessful attempt to contract, the court will seek to restore the parties to the *status quo ante* if possible.

"In general, recovery for unjust enrichment is based upon what the person enriched has received rather than what the opposing party has lost." *Grisanti v. Zanone III,* 2010 Ark. App. 545, 336 S.W.3d 886. Accordingly, to find unjust enrichment, a party must have received something of value to which he was not entitled and which he should restore. *Sparks Regional Medical Ctr. v. Blatt,* 55 Ark. App. 311, 935 S.W.2d 304 (1996). However, there must be some operative act, intent, or situation that makes the enrichment unjust and compensable. *Id.* It is not necessary, in order to create an obligation to make restitution, that the party unjustly enriched should have been guilty of any wrongful act. *Frigillana v. Frigillana,* 266 Ark. 296, 584 S.W.2d 30 (1979); *Malone v. Hines,* 36 Ark. App. 254, 822 S.W.2d 394 (1992). Even an innocent party who has been unjustly enriched may be compelled to surrender the fruits to another more deserving party. *Smith v. Whit-*

---

6. We note that Hall, in the prayer of her complaint, asked that she have judgment for the Biases' unjust enrichment.

*ener,* 42 Ark. App. 225, 856 S.W.2d 328 (1993). The remedy is neither given nor withheld automatically, but is awarded as a matter of judgment. *Friends of Children, Inc. v. Marcus,* 46 Ark. App. 57, 876 S.W.2d 603 (1994).

The remedy of unjust enrichment requires a fact-based inquiry. *See Grisanti, supra,* at 6, 336 S.W.3d at 889–90. It involves the weighing of the equities and a determination of the value unjustly received. For example, if a person has received property under an invalid contract, restitution is limited to the return of the property, together with the value of its use. *See* 66 Am.Jur.2d *Restitution and Implied Contracts* § 187 (2001); 2 Dan B. Dobbs, *Law of Remedies* § 11.5 (2nd ed.1993). However, that person may be entitled to offset his monetary restitution by the amounts previously paid under the invalidated contract and for taxes and insurance paid upon the property. *See* 66 Am.Jur.2d *Restitution and Implied Contracts* § 162 (2001). The court may also be required to consider equitable defenses such as unclean hands and laches. *See* 66 Am.Jur.2d *Restitution and Implied Contracts* §§ 27, 28 (2001).

Based on the foregoing principles, the trial court must weigh the equities given the unique facts of this case. Here, the court found that Hall knew or should have known that there was a possible misunderstanding regarding the terms of the transaction since at least September 2005. However, the court found that Hall had made payments on the property up until April 2007 and that she had been making the payments for six and one-half years. The court further found that Hall was inexperienced in land transactions. Finally, the court found that Hall had enjoyed the use and benefit of the property during the period in question.

As for the Biases, the trial court found that the Biases had treated Hall as the owner of the property and had done nothing to interfere with her use of it. The court noted that the Biases had also lost the opportunity to sell or lease during the term of the attempted sale. Finally, the trial court found that the Biases were not guilty of any fraud or wrongdoing.

However, upon remand, there may be other facts not previously addressed by the trial court that may be considered in fashioning an equitable remedy. For example, as noted in a footnote in the majority opinion, Hall testified that she only visited the property on three occasions, and, on those occasions, she only looked at the property. She never ate a meal there, never spent the night there, and did not remove anything or make any improvements to the property. Additionally, Tim Bias admitted that he did not have title to the property, but was only in the process of purchasing the property from Bay View Financial at the time of the purported sale—a fact not disclosed to Hall. It is further undisputed that the Biases also continued to accept payments from Hall despite her failure on several occasions to sign a written contract.

There may be other evidence the trial court may wish to consider upon remand, and the weight to be given to such evidence, if any, is in the province of the trial court. However, when applying the unjust-enrichment remedy, Hall should be allowed to recoup her payments to the extent, if any, that her payments exceeded the fair rental value of the property and to the extent her claims are not barred by some equitable defense. Likewise, the Biases should be allowed to recoup the fair rental value of the property unless it is determined that their claims are barred by some equitable defense. Here, the issue to be resolved by the trial court is to

what extent either party was *unjustly* enriched; and generally the *status quo ante* should be restored if possible.